Filed 1/9/26; certified for publication 2/3/26 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RYAN HIGGINSON, | D082322, D083026 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2020-00010610-CU-BC-CTL) |
| KIA MOTORS AMERICA, INC., | |
| Defendant and Respondent. | |

CONSOLIDATED APPEALS from a judgment and postjudgment orders of the Superior Court of San Diego County, Gregory W. Pollack, Judge. Reversed and remanded with directions.

Strategic Legal Practices and Payam Shahian, Tionna Carvalho; Greines, Martin, Stein & Richland and Cynthia E. Tobisman, Joseph V. Bui, Gary J. Wax, Anne Guidroz; Ecotech Law Group and Dara Tabesh, for Plaintiff and Appellant.

Horvitz & Levy and Lisa Perrochet, Shane H. McKenzie, Rebecca G. Powell; SJL Law, Julian G. Senior and Marcelo Lee for Defendant and Respondent.

# I. INTRODUCTION

Plaintiff and appellant Ryan Higginson sued defendant and respondent Kia Motors America, Inc. (Kia), alleging that Kia's conduct in connection with defects in the engine of his 2013 Kia Soul violated the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.; the Song-Beverly Act) and the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.; CLRA), and constituted fraud. Because Higginson failed to attach to his initial complaint a venue affidavit required by the CLRA, the trial court dismissed that cause of action without leave to amend, despite the fact Higginson filed a venue affidavit before filing an amended complaint.

During discovery, Higginson requested that Kia produce documents regarding (among other things) internal investigations and communications with government agencies regarding alleged engine defects. When Kia responded with boilerplate objections, Higginson obtained a court order directing Kia to respond without objections to a narrowed, court-approved definition of "engine defects." Kia served verified supplemental responses attesting that responsive documents "never existed." The Kia employee who verified the discovery responses testified in deposition that Kia conducted a diligent search, that Kia employees followed their usual protocol of searching for records that referenced individual defect symptoms (as opposed to searching only for records that referenced *every* defined symptom), and confirmed that the verified discovery responses were accurate when claiming that responsive documents never existed.

Higginson suspected Kia's responses were false because his counsel had seen a letter from the National Highway Transportation Safety Administration (NHTSA) requesting that Kia produce certain documents regarding alleged engine defects. Higginson showed this letter to the

2

trial court, seeking an order compelling Kia to comply with the court's earlier discovery order. The trial court denied the motion, accepting Kia's code-compliant discovery responses. But the court warned that if Kia "got away with one today," the court would likely "figure that out, and there will be a way of balancing the scales of justice."

On the eve of trial (before a different judge), Higginson's counsel found on NHTSA's public website a letter from Kia agreeing to produce records in response to NHTSA's investigation mentioned above. Although Kia's response letter and its referenced document production would be responsive to Higginson's discovery requests, Kia never produced them in this case. Upon making this discovery, Higginson moved for terminating sanctions. The trial court — recognizing that Kia's verified discovery responses were false but declining to find they were willfully so — contemplated declaring a mistrial and setting a new trial date sometime after Kia produced the responsive documents. Kia insisted its responses were accurate but finally revealed to the court that its records search was based on a conjunctive approach to the definition of "engine defects" that found a document responsive only if it related to every symptom listed in the court-adopted definition. The trial court found that this approach was not reasonable and was " 'dead on arrival.' " Yet, the court denied Higginson's request for terminating sanctions and instead instructed jurors that Kia's discovery responses "incorrectly stated" Kia had no responsive documents and that *if* the jury found that "Kia's response[s] . . . w[ere] intentionally false," the jury could "decide that production of the documents would have been unfavorable to Kia." But the court later excluded from jury consideration NHTSA's letter and Kia's response on evidentiary grounds. This excluded the only evidence Higginson had to prove that Kia's discovery verifications were knowingly

3

false.  Absent this evidence, the trial court's special jury instruction only confused the jury.

Without discovery from Kia, Higginson had no trial evidence to establish his fraud claim.  Accordingly, the trial court granted Kia's motion for nonsuit on that claim.  And while the jury found that Higginson had proved an engine defect existed, the jury also found — without evidence about the possible unknown extent or irremediable nature of that defect — that Kia had remedied it.  Accordingly, the jury returned a defense verdict.

Higginson moved for a new trial on the ground that Kia's nonproduction of responsive documents constituted an irregularity in the proceedings that deprived him of a fair trial.  (Code Civ. Proc., § 657, subd. (1).)[1]  Kia opposed the motion, arguing Higginson was improperly relitigating the parties' long-settled discovery dispute, and further blaming Higginson for not seeking to remedy Kia's nonproduction of documents sooner.  The trial court requested supplemental briefing not on Kia's discovery misconduct, but on when Higginson's counsel first became aware of NHTSA's letter and Kia's response to it.  When it turned out that Higginson's counsel had received those records months or years earlier *in connection with other cases involving different plaintiffs*, the trial court denied Higginson's new trial motion.  The trial court entered judgment for Kia and awarded Kia its costs as the prevailing party.

Higginson raises several issues on appeal.  First, he contends the trial court erred by sustaining *without leave to amend* Kia's demurrer to his CLRA claim.  Because the CLRA provides that the remedy for failing to file the required venue affidavit is to "dismiss the action *without prejudice*" (Civ.

---

1    Further undesignated statutory references are to the Code of Civil Procedure.

4

Code, § 1780, subd. (d), italics added) — that is, *with* leave to amend — we agree the trial court erred and should have granted Higginson leave to amend. On remand, the trial court is directed to grant Higginson leave to amend his CLRA cause of action.

Second, Higginson argues the trial court erred by denying his requests for terminating sanctions and for a new trial based on Kia's discovery misuse. We conclude the trial court acted within its discretion in initially denying Higginson's request for terminating sanctions and instead instructing the jury that it could draw a negative inference from Kia's nonproduction of documents if the jury found it was intentional. But after the trial court's exclusion of evidence left Higginson unable to prove Kia's conduct was intentional, the court's selected remedy became inadequate and the trial court should have protected his right to a fair trial by later granting Higginson a new one. In denying Higginson's motion, the trial court erred by focusing on the perceived failure of Higginson's lawyers to discover sooner that Kia committed discovery misuse, rather than by focusing on Kia's misuse itself. Indeed, apart from the inadequate jury instruction, Kia's discovery misuse went completely unremedied and Kia still has never produced significant responsive documents in this case.

Because Kia's unremedied discovery misuse deprived Higginson of a fair trial, we reverse the judgment with directions that the trial court grant Higginson a new trial and impose discovery sanctions on Kia in an amount sufficient to compensate Higginson for the costs and attorney fees he incurred in connection with the first trial and this appeal. Our reversal of the judgment also operates to vacate the award of prevailing-party costs to Kia.

Accordingly, the judgment is reversed, with directions as further specified in the Disposition.

5

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Vehicle History

In 2013, Higginson leased a new Kia Soul with a 1.6-liter engine that Kia referred to as a "Gamma" engine. At the time, no one at Kia or the repair facility told Higginson the car would have an engine defect or mechanical problems. Higginson testified that had someone told him this, he would not have purchased the car. In July or August 2016, Higginson exercised an option to purchase the vehicle. Up to that point, he had no issues with it.

In February 2018, when the car had just over 91,700 miles on it, Higginson took it to the dealer, complaining of a rattling noise when going uphill, and a crunching sound when accelerating in first and second gear. The dealer recommended a fuel induction service and spark plug replacement; Higginson opted only to replace the spark plugs. When that did not resolve the issue, Higginson returned to the dealer, which diagnosed the issue as excessive carbon buildup in the engine. Against Kia's recommended practices, the dealer conducted a flushing service, which caused the engine to not start. Kia resolved this problem by replacing the engine's cylinder heads. Three years after this service, the engine showed no carbon buildup.

In May 2019, Higginson returned to the dealer after he received a safety recall campaign notice — referred to as "SC176" — regarding potential overheating of the car's catalytic converter, which could lead to an engine

fire.[2]  Kia's service campaign addressed this issue by performing a software update to the car's engine control unit.  When Higginson brought his car in for the recall, he also complained that the steering system made a "crunching popcorn sound" when turning.  The dealer performed the prescribed software upgrade for the engine control unit and applied a lubricant to the steering column.

A few months later, in August 2019, Higginson returned to the dealer complaining that the steering issue was not resolved.  About that time, Higginson called Kia to request that the company repurchase his vehicle because of the engine and steering issues.  Kia did not return his calls.

---

[2]    The safety recall campaign notice states, in part:  "Under certain conditions, the catalytic converter may become damaged due to overheating caused by an excessive increase of exhaust gas temperatures.  If the catalytic converter is damaged, substrate particles can enter the engine combustion chamber and cause abnormal engine combustion.  Continuous abnormal engine combustion can result in damage to one or more of the engine's pistons which can cause piston rod breakage, potentially puncturing the engine block allowing engine oil to escape.  Engine oil that contacts a hot exhaust surface may result in a fire."

## B. The Pleadings

In February 2020, Higginson sued Kia, alleging his vehicle had defects that substantially impaired its use, value, or safety.[3] He alleged Kia knew or should have known his vehicle (and others) had an engine that was "susceptible to sudden stalling while at any speed and/or to burst into flames." Citing Kia's recall campaign, Higginson alleged the defects were due to overheating catalytic converters, which could damage connecting rods and fracture the engine block, causing oil leaks and resulting in "catastrophic engine damage and fires." According to Higginson, Kia allowed the vehicle to be sold to him without disclosing that the vehicle and its engine were defective and susceptible to sudden and catastrophic failure, and that had he known of the defects at the time of the sale, he would not have leased or purchased the vehicle.

Based on these alleged defects, Higginson alleged causes of action for violations of various provisions of the Song-Beverly Act; breach of express warranty and the implied warranty of merchantability; fraud by omission; and violation of the CLRA. Higginson did not accompany his original complaint with a venue affidavit for his CLRA cause of action, but he filed such an affidavit a few months later (in August 2020).

---

[3]     Higginson alleged that "[d]uring the warranty period, [his car] contained or developed defects, including but not limited to, defects related to the engine; defects causing a rattling noise upon acceleration; defects requiring the performance of an engine control unit ('ECU') upgrade; defects causing a failure to start; defects causing the failure and/or replacement of the cylinder head and gaskets; defects causing a grinding sound; defects causing the failure and/or replacement of the spark plugs; defects causing the steering wheel to make a popcorn sound when turning; defects requiring the upper struts to be lubricated; and/or any other defects described in the repair history for the [car]."

In September 2020, Higginson filed a first amended complaint that alleged the same defects and causes of action.

Kia demurred to the amended complaint. As relevant to this appeal, the trial court (Judge Joel Wohlfeil) sustained the demurrer without leave to amend as to Higginson's CLRA cause of action because he failed to file the CLRA venue affidavit "concurrently" with his original complaint as required by Civil Code section 1780, subdivision (d).

## C. Discovery Proceedings

### 1. Higginson's Requests for Production of Documents

Higginson propounded formal discovery requests to Kia seeking documents — broadly defined to include electronically stored information (ESI) such as emails — relating to the alleged engine defects in 2013 Kia Souls like Higginson's.[4] Higginson's requests for production (RFPs) included requests for internal analyses or investigations (RFP No. 17); documents concerning decisions to issue recalls, technical service bulletins (TSBs), or warranty extensions (RFP No. 20), or to modify the design of the engine or its components (RFP No. 21); customer complaints and warranty claims (RFP No. 22); and communications between Kia "and any government agency or entity," such as NHTSA (RFP No. 56). Higginson simultaneously sent Kia a

---

[4] Higginson's requests included the following definition: "The term 'ENGINE DEFECT(S)' shall be understood to mean such defects which result in symptoms, including, restriction of oil flow through the connecting engine rod bearings; increased risk of non-collision fire; rattling sound upon acceleration; symptoms requiring performance of an engine control unit ('ECU') upgrade; failure to start; failure and/or replacement of the cylinder head and/or gaskets; grinding sound; failure and/or replacement of the spark plugs; and/or any other similar concern identified in the repair history for the SUBJECT VEHICLE."

9

"meet and confer letter regarding ESI" asking Kia to (among other things) identify its "proposed search terms."

In response to Higginson's RFPs, Kia asserted boilerplate objections and refused to produce documents regarding alleged engine defects. Kia did not meet and confer with Higginson regarding search terms. Kia did, however, agree to produce limited documents regarding the service and warranty histories of Higginson's vehicle and certain TSBs.

In a further effort to meet and confer, Higginson made a "proposed compromise" to narrow many of the RFPs' definitions and categories. As relevant, Higginson proposed to narrow the definition of "engine defects" to the following: "The term 'ENGINE DEFECT(S)' shall be understood to mean such defects which result in symptoms, including: restriction of oil flow through the connecting engine rod bearings; increased risk of non-collision fire; rattling sound upon acceleration; engine knock; engine nonstart; cylinder head failure; and engine grinding sound." Kia did not respond to the proposed compromise.

### 2. The Discovery Order

Higginson moved to strike Kia's objections and compel further responses to the RFPs. Higginson reasoned that Kia must possess responsive documents because his RFPs were "substantially similar in form to ones believed to have been requested by NHTSA" as part of its own investigation into Kia's Gamma engines. Higginson's motion cited and attached a letter dated April 12, 2019, from NHTSA to Kia (the NHTSA Letter) requesting documents regarding any investigation and analysis into alleged defects, any related vehicle component modifications, and customer complaints or warranty claims. The letter mentioned that NHTSA had received 244

10

complaints of non-crash fires in Kia vehicles, some of which were equipped with Kia's Gamma engine. The motion noted that Kia's deadline to respond to the NHTSA letter had passed, which suggested that Kia had likely already produced documents responsive to NHTSA's requests. Higginson maintained that those documents would also have been responsive to his RFPs.

At an October 28, 2020 hearing, the trial court (Judge Wohlfeil) granted Higginson's motion, in part.[5] The court adopted Higginson's proposed narrower definition of "engine defects" and ordered Kia to produce — "without objection" — responsive documents regarding Kia Souls sold in California.

### 3. Higginson Moves to Compel Compliance with the Discovery Order

On November 17, 2020, Kia served further responses to Higginson's RFPs, followed a few weeks later by verifications signed under penalty of perjury by Kia employee Deborah Avalos. Kia's new responses included objections to the court-adopted definition of "engine defects," including that the definition was "vague, ambiguous, compound and overly broad"; was "not reasonably calculated to lead to the discovery of admissible evidence"; and "requires expert witness opinions." Subject to these objections, the relevant

---

[5] The court sustained Kia's attorney-client privilege and attorney work-product objections to the RFP seeking documents regarding communications with government agencies. The court ordered Kia to promptly produce a privilege log itemizing any otherwise-responsive documents it withheld on privilege and work-product grounds. This aspect of the trial court's ruling is not at issue here.

11

responses indicated Kia had no responsive documents to produce.[6] Specifically, Kia's verified responses to these RFPs stated: "A diligent search and a reasonable inquiry have been made in an effort to comply with this demand as stated with the amended definition and scope from the court's October 28, 2020 order. [*Kia*] *is unable to comply because documents responsive to this request have never existed.* [Kia] is not aware of any other person or organization with possession, custody or control of documents responsive to this request." (Italics added.)

Higginson attempted to meet and confer with Kia regarding the supplemental responses. Kia responded that the objections in its supplemental responses were proper. Higginson reminded Kia that the trial court had ordered production "without objection." He also "expressed incredulity that [Kia] claimed to have performed a search that yielded not a single page of new documents." He asked Kia to explain the search it conducted. Kia responded by maintaining that the trial court contemplated that Kia could object to the new definition of "engine defects." Kia did not address Higginson's request to explain the search it conducted.

Higginson moved "to compel compliance with the October 28, 2020 discovery order." He argued Kia violated the order by asserting objections.

---

[6] Kia gave this response to Higginson's RFP Nos. 17, 20, 21, 22, 23, 25, and 56. These asked for documents concerning internal analysis or investigation regarding engine defects (RFP No. 17); decisions to issue any notices, letters, campaigns, warranty extensions, TSBs and recalls concerning the engine defects (RFP No. 20); decisions to modify the engine system, and/or any of its component parts, in Kia vehicles as a result of engine defects (RFP No. 21); customer complaints, claims, reported failures, and warranty claims related to engine defects (RFP No. 22); failure rates of Kia vehicles as a result of the engine defects (RFP No. 23); failure mode and effects analysis concerning engine defects (RFP No. 25); and documents regarding communications with any government agency or entity, such as NHTSA, regarding the engine defects (RFP No. 56).

He also argued that Kia's claim that it had no responsive documents lacked credibility. Higginson asked the court to order Kia to produce its verifier for deposition to explain the search that yielded no response.

While Higginson's motion was pending, Kia served further supplemental responses that omitted the challenged objections but continued to assert under penalty of perjury that responsive documents "never existed." In light of these responses, Kia argued to the court that Higginson's motion was moot.

Higginson countered that his motion was not moot because there was still a "pressing need for an order" to ensure Kia had truly conducted a diligent search to determine whether responsive documents exist. Higginson remained skeptical, particularly in light of the NHTSA letter he previously mentioned in connection with his initial motion to compel.

At the February 10, 2021 hearing on Higginson's motion, his counsel characterized Kia's further supplemental responses as "code-compliant" but "incredible," thus justifying further inquiry into the scope of Kia's search. Kia's counsel agreed that its responses were code-compliant and insisted "there [were] no responsive documents to [Higginson's] request." To the extent Higginson was not satisfied with that response, Kia's counsel faulted Higginson for not propounding formal discovery to explore the scope of Kia's search.

The trial court (Judge Wohlfeil) denied Higginson's motion. Although the court found it "troubling" that Kia had initially "included objections in [its] responses after the court had issued an order telling [Kia] not to do so," the court was "comfortable" with Kia's verified discovery response and its attorney's affirmation at the hearing that no responsive documents existed. The court warned, however, that if Higginson "ultimately prove[d] that

13

[Kia]'s responses were not credible," that circumstance "may lend itself to additional consequences at or before trial." The court elaborated: "In my experience, these things have a way of coming full circle. So, if one side . . . got away with one today, I suspect that eventually the court will figure that out, and there will be a way of balancing the scales of justice." The court clarified, however, that its comments were "just dictum" and the court was "not accusing or much less finding that the defense ha[d] gotten away with one."

### 4. Higginson Deposes Kia's RFP Verifier

About one month later, Higginson took the deposition of the Kia employee who verified Kia's RFP responses, paralegal Deborah Avalos. Avalos testified that she searched for responsive documents by requesting information from the relevant departments within Kia based on the court's revised definition of "engine defects." Those departments, in turn, ran queries for responsive documents and reported their findings back to Avalos. Avalos accepted the departments' responses and did not ask follow-up questions, even when the departments reported that they had no responsive documents. Avalos did not recall specifically how the departments ran their queries in this case — "using all of the terms [within the definition of 'engine defects'] together" or "running the terms individually" — but she clarified that the departments "normally run it both ways, all together and separate," and that Kia's search in this case was not "any different than the search they normally do." Avalos was shown the NHTSA Letter during her deposition, but she did not know if she had seen it before.

Higginson also sought to depose Kia's "person most qualified" regarding Kia's search for responsive documents, incidence and symptoms pertaining to

14

the defined "engine defects," and Kia's "awareness of these issues in 2013 Kia Soul vehicles over time." Kia objected to Higginson's deposition notice, including to the court-adopted definition of "engine defects." The parties ultimately narrowed the deposition topics to exclude those technical matters pertaining to "engine defects" and topics related to Avalos's search, without prejudice to Higginson's right to that additional discovery.

### 5. Kia Moves for Summary Adjudication

In May 2021, about three months after the most recent discovery hearing, Kia moved for summary adjudication of certain of Higginson's claims. Higginson responded that Kia's failure to produce responsive documents and knowledgeable deposition witnesses justified denying Kia's motion or, at a minimum, warranted a continuance to allow further discovery. As evidence that Kia was improperly withholding responsive documents, Higginson's counsel again cited the NHTSA Letter.[7] In reply, Kia argued no further discovery was necessary because it had already served "truthful[]" supplemental RFP responses that confirmed no responsive documents existed.

The trial court (Judge Wohlfeil) denied Higginson's request for further discovery and granted Kia's motion, in part. As to discovery, the court found Higginson's request for a continuance was untimely: "[Higginson] has had several months to conduct discovery and seek court intervention with respect to any discovery disputes. Specifically, the discovery disputes reflected

---

[7] Higginson's attorney also cited (1) a consent order between Kia and NHTSA involving a different engine (the Theta II Engine) in which Kia had made "a voluminous production of information"; and (2) a Los Angeles superior court's order in a different case denying Kia's motion for summary adjudication because evidence showed Kia was aware of engine defects in its vehicles.

within [Higginson's opposition papers] took place in early 2020. However, the opposition to this motion was filed on July 26, 2021. Even assuming [Kia] has not properly responded to written discovery and did not participate in the [person most qualified] deposition in good faith, [Higginson] had ample time to remedy these issues prior to filing the opposition to this motion. Trial is currently scheduled for October 22, 2021. Thus, [Kia] cannot reasonably delay filing this motion. Given these circumstances, a denial or continuance of this motion is not warranted."[8]

On the merits of Kia's motion, the court granted summary adjudication in part, leaving Higginson with claims for (1) violating the Song-Beverly Act by failing to repurchase or replace the subject vehicle, (2) breach of express warranty, and (3) fraud by omission.

### 6. Higginson Seeks Terminating Sanctions on the Eve of Trial

After numerous continuances,[9] the matter was called for trial in November 2022. On November 10, 2022, the case was reassigned for trial from Judge Wohlfeil to Judge Gregory Pollack.[10]

---

[8] A decision to grant or deny a request for continuance to oppose a summary judgment motion is "vested in the trial court's discretion." (*Braganza v. Albertson's LLC* (2021) 67 Cal.App.5th 144, 152.) Higginson did not further challenge the court's continuance order by seeking a writ or other review, and he does not argue on appeal that the court abused its discretion by denying his requested continuance.

[9] When the trial court granted these continuances, the court did not reopen discovery.

[10] Our discussion of trial court actions taken after this reassignment are to actions taken by Judge Pollack.

16

On the first day of trial (Monday, November 14, 2022), one of Higginson's trial lawyers informed the court that Higginson was preparing to move for terminating sanctions based on her firm's discovery just days earlier of proof that Kia engaged in "a very huge discovery abuse" by serving false RFP verifications and withholding "responsive documents that should have been produced." The attorney explained: "On Friday, for the first time, we saw that . . . the . . . verifier of the discovery responses . . . verified it falsely. [¶] . . . [¶] The managing partner at my firm has been working all weekend on this issue because we just found all of these publicly available documents that were not even in the production. And it's very concerning because it goes directly to all of our elements in the trial in this matter. [¶] For example, it shows that they knew of these defects; that they did not know how to fix them; that they had all these internal investigations going on. And that goes directly to our request for civil penalties in the matter, in addition to our fraud cause of action." Higginson's attorney explained that Judge Wohlfeil had denied Higginson's earlier motion to compel compliance "based on the fact that the [RFP] verifier had stated that everything was produced and that responses were code compliant." Counsel insisted that the anticipated sanctions motion was "by no way a means to continue trial or anything like that." When the court asked counsel if she had what she "need[s] to prove [her] case against [Kia]," counsel responded, "We have the documents here, yes."

For his part, Kia's trial counsel responded that he "was involved during this discovery phase" and that there were "no documents that have been withheld in response to any discovery requests." Counsel said he would "fully address" Higginson's sanction request once a motion was filed. Kia's attorney also informed the court that he suspected many of the documents that

17

Higginson would use to show that Kia withheld responsive documents in this case were produced in another case subject to a protective order and that Higginson's use of those documents in this case was "probably a violation of that protective order."

The next day, Higginson filed a motion for terminating sanctions or, alternatively, for issue or evidentiary sanctions. He argued that the requested relief was warranted because Kia "(1) intentionally withheld damaging evidence, in violation of the court's October 28, 2020 discovery order; (2) falsely claimed in its second supplemental responses that no responsive documents exist (when responsive documents do exist . . .); [and] (3) falsely verified those responses." Higginson's motion explained how the proof of Kia's alleged misconduct came to light. The week before trial, Higginson's trial counsel told her firm's managing partner that Kia had produced no documents in response to the court's discovery order, claiming no documents existed. "Surprised by [this]," the managing partner looked through other NHTSA investigations and other information that Kia had produced in other cases the firm was handling. This investigation led to the discovery of documents produced in *Creighton v. Kia Motors America, Inc.* (Super Ct. Sac. County, 2018, No. 34-2018-00234795), which, although it related to a different Kia engine (the Theta II engine), involved a voluminous document production that included documents regarding internal investigations and communications regarding the Gamma engine at issue in this case. Higginson's lawyers then visited NHTSA's website and found a letter dated June 28, 2019, from Kia to NHTSA (Kia's Response Letter) responding to the NHTSA Letter. Kia's response — which Kia never produced in discovery in this case — referenced Kia's production of

18

documents responsive to NHTSA's requests, some of which were also responsive to Higginson's requests.

The court did not address the sanctions motion until after trial testimony began. The managing partner of the law firm representing Higginson argued the motion along with trial counsel. The managing partner explained that although he "usually do[es]n't come into these arguments," he was arguing in this case "because [it] is a serious matter" involving "a willful failure to respond with responsive documents." When the court interjected, "But we have the documents, though, right?" the managing partner responded, "No, no, no. We don't have the documents." The managing partner elaborated that while he "provided the court with only publicly available documents" regarding NHTSA, his junior "attorneys didn't even know that such documents existed because they[] [were] looking at [Kia's] verified response . . . that says no documents exist." The court replied, "If what you're saying is correct, you still don't have the documents you requested in discovery. And those documents could well be relevant in this case."

Exploring possible remedies, the court posited that "one option on the table is to declare a mistrial and order the defense to pay all of plaintiff's attorneys' fees and costs associated with this trial up to now and then" set a new trial date after Higginson had "an opportunity to get the[] documents and take whatever discovery is necessary." The managing partner found this proposal acceptable; indeed, he was willing to accept a mistrial *without* receiving attorney fees and costs. The court suggested that another possible "alternative would be to just continue on with this trial and come up with some harsh jury instructions. But that seems inadequate if there's still

discovery out there that has been blocked from the plaintiff, that the plaintiff's entitled to get."

Kia responded that Higginson was improperly trying to relitigate the motion to compel compliance that Judge Wohlfeil had already addressed. The court probed, "But if your response is '[documents] don't exist,' a judge ruling on a motion to compel . . . where the party's response is, 'they don't exist,' has no choice but to deny the motion. You can't compel production of that which doesn't exist. The problem here is the response was wrong." Kia responded, "It's not wrong."

Kia then pivoted to the timing of Higginson's sanctions request, asking, if Higginson's attorneys "had [the NHTSA Letter] back at the verifier's deposition . . . about a year ago," then "why didn't this motion get brought until the middle of trial?" The court redirected this question to Higginson. The managing partner explained that after Judge Wohlfeil denied the motion to compel compliance based on the verified RFP responses, the associate attorneys handling the case "didn't know what else to do" other than to rely on Kia's verified responses. The court responded, "But you had the NHTSA reports that showed there had to have been documents." The managing partner answered, "Well, their testimony was there was no such documents," and "there is not much we can do when somebody already provides verified responses and then says there is no documents.' . . . You can't make a falsified verification response . . . that we rely on and then claim, 'Well, why didn't you come in earlier and get sanctions.' " The court asked how plaintiff's counsel could say their "reliance was reasonable" when they had "public documents that would show that clearly [Kia's] response . . . was inaccurate." The managing partner explained that, despite his firm's attorneys having shown Judge Wohlfeil "some of those documents" in

20

connection with the motion to compel compliance, the court denied the motion "because [Kia] provided a code-compliant response."

The trial court asked the attorneys if they had agreed on search terms for Kia to use in responding to the RFPs. Kia claimed they had; Higginson claimed they had not and that Kia had refused to even meet and confer on the issue. The court clarified, "When it comes to . . . my court, [the parties] don't get out of the court until there's an agreement on what the search terms are going to be," after which the parties and the court engage in an iterative process to "keep whittling it down until we get a reasonable number of documents." When the court asked Kia's counsel, "Did that happen or not?" counsel responded, "It did." When the court directed Kia, "Tell me what the search terms were," Kia responded by reading the court-adopted definition of "engine defects." In trying to clarify whether Kia had searched only for the entire definition of "engine defects" or its component elements, the court clarified, " 'Search term' is a term of art. [¶] . . . [¶] If you describe a bunch of defects in kind of a narrative fashion, that wouldn't be considered a search term." Kia did not respond to this, but rather, changed the subject to the timing of Higginson's sanctions request. When the court again asked, "What were the search terms that were used?" Kia deferred to Avalos's deposition testimony that Kia "ordinarily run[s] a query using all of the terms together and running the terms individually." This appeared to satisfy the court.

The trial court revisited the timing of Higginson's sanctions request, asking why he was making the request "in the middle of trial" when it appears that the documents giving rise to the request were already in his lawyers' files. The managing partner explained that his associate attorneys handling *this* case had no impetus to search Kia's production in *other* cases, particularly when Kia said it had no responsive documents and did not

21

otherwise direct Higginson's counsel to Kia's document productions in other cases (as Kia often did). The managing partner emphasized that it was only in his role as managing partner that the issue came to light because the associate attorneys at his firm "don't know that people lie in verified responses, and they're relying on those representations."

At this point, the trial court declined to declare a mistrial, reasoning Higginson should have raised the issue sooner: "Since the wrongful behavior on the part of Kia was available to the plaintiff months ago or even years ago, I really can't declare a mistrial because, basically, during trial it surfaced that there were things in the plaintiff's file that they didn't really realize the significance of until they were doing their final preparation." Instead, the court stated it would continue to evaluate the appropriate remedy based on evidence introduced at trial regarding Kia's noncompliance with its discovery obligations. The court warned, "At a minimum, . . . if the evidence is that there [were] improper discovery responses, it will clearly be met with a very strong jury instruction."

Later that day, after the conclusion of Higginson's live witnesses — he still intended to read the deposition testimony of RFP-verifier Avalos — Higginson dismissed his express warranty claim. Kia then moved for nonsuit on Higginson's fraud cause of action. The court observed that it had "not heard any evidence of fraud." Higginson's counsel explained that this was because of Kia's discovery misconduct in failing to produce documents. The court asked, without Kia's production, "what evidence is the jury going to see? Your feeling that if [Kia] had complied there might be other stuff? That can't be . . . argued to the jury. If it's not in evidence it can't be argued to the jury." The court deferred ruling on Kia's nonsuit until the close of all evidence.

The next day, the accuracy of Kia's RFP responses resurfaced when the court and counsel were discussing the admissibility of the NHTSA Letter. Higginson argued it was necessary to admit the letter to prove the falsity of Kia's verified RFP responses that it had no responsive documents and of Avalos's related deposition testimony.[11] The court indicated it was inclined to admit the letter with a limiting instruction that the jury "can't consider the letter for the truth of any facts asserted therein. But they can consider it as something that, based on the evidence here, may have been seen [by Avalos] and not produced."

Higginson acknowledged the evidentiary hurdle created by the fact that Kia's Response Letter was not used as an exhibit during Avalos's deposition. But he argued the publicly available document should still be admitted because it showed Kia falsely asserted in its verified RFP responses that it had no responsive documents.

Upon further reflection, the trial court ruled the correspondence between Kia and NHTSA was inadmissible on evidentiary grounds and — due to Higginson's delay in raising the issue — would not be admitted to establish the falsity of Kia's RFP responses. While addressing the admissibility of Kia's Response Letter, the trial court asked Kia's counsel for his view on why that letter was not responsive to Higginson's RFPs. The attorney explained that Kia found no responsive documents "because the search terms . . . were defined with the conjunctive, not the disjunctive," and the response letter did not address *every* symptom included in the definition

---

[11]    In this context, the trial court characterized as "squirrely" Avalos's deposition testimony that she may or may not have seen the NHTSA letter.

of "engine defects."[12]  After counsel reiterated this view, the court interjected, "Wait a minute.  It has to have *all* of those things?  [¶] . . . [¶] [T]hey would have to have every single one of those conditions to be produced?"  The court "reject[ed] the defense's position" as a "garbage argument," that is "not a fair" or "reasonable reading at all" of the definition of "engine defects."  The court added, "No judge would have said that all of those defects have to be present . . . .  That would make no sense at all."  Based on Kia's approach to the search process, the court concluded "it's clear . . . that [Avalos's RFP] verification was erroneous; that, indeed, there were documents responsive.  There's no other way to look at this. . . .  This response was inaccurate, okay."  The court asked, "So what do we do?"

The court acknowledged the dilemma created by the court's exclusion of the correspondence between Kia and NHTSA:  "I don't think we can just give the jury the NHTSA request and that response . . . because it has . . . all kinds of stuff they shouldn't see.  But if we give them nothing, then we have a situation where, if we go only on the evidence . . . , I have to grant the fraud nonsuit because there's no evidence.  But why is there no evidence?  Because there was a false verification."  As to the false verification, the court clarified, "When I say false, . . . I'm not going to make the court finding that this was a willful intent to deceive.  I'm just saying that . . . the RFP response that there were no documents was just wrong.  But by giving that response, it really cut off plaintiff's ability to discover."

Surmising that the false verification related only to Higginson's fraud cause of action, the trial court raised the prospect of bifurcating Higginson's

---

12    Counsel elaborated:  "So when she ran the search with the conjunctive, there were no responses; because this letter may mention fires, but it doesn't mention rattle noise, it doesn't mention oil chamber restriction, some other issues that they claim."

24

Song-Beverly Act claim from his fraud claim. But Higginson objected that the false verification also impacted his claim for a civil penalty under the Song-Beverly Act, as unproduced Kia records could show that Kia was aware it was unable to resolve certain alleged defects. The court responded, "You're right, that could surface."

But the court was "still troubled by the fact that" the false verification "was brought up so late." The court elaborated: "It troubles me that you had . . . the NHTSA request and Kia's response, and nothing further was done once Judge Wohlfeil ruled. I mean, a trial court does have the power to revisit a law-and-motion ruling, okay. I'm not saying I can't do that, but I'm not inclined to do that. This should have been brought up. It should have been taken back to Judge Wohlfeil. A writ could have been taken if he outright refused to do anything about it. It's not for the court — not only in the middle of trial, the very last day of trial — to deal with this discovery issue." The court considered instructing the jury that it could consider Kia's false verification "in deciding the case," but the court recognized that this approach "wouldn't give [Higginson] a fraud cause of action."

As to the falsity of Kia's verification, the court acknowledged it "was false," but the court expressly declined to find that "it was intentional." The court theorized that "it may have been negligent, left hand didn't know what the right hand was doing. There could be some benign explanation." After all, the court reasoned, the fact "that Kia has already produced [the responsive documents] in other litigation . . . suggests the failure to produce it here may have been as a result of innocence or negligence as opposed to intent, because . . . why would you intentionally pull something back that you already produced to the litigation world?" Ultimately, the court concluded the question of the falsity of the  verification "should go to the jury as a jury

25

instruction." Based on that approach, the court indicated it would grant Kia's nonsuit on Higginson's fraud claim, based "on the absence of evidence," if Kia were to renew the motion at the close of evidence. Kia later renewed its nonsuit motion and the trial court granted it.

The court eventually fashioned the following special jury instruction to address Kia's RFP responses: "204.2 [¶] During pretrial discovery, Kia was asked to provide certain documents to Mr. Higginson's attorney. Kia's written responses, verified by Kia's representative Deborah Avalos, incorrectly stated that there were no documents that were responsive to the request. If you decide that Kia's responses that there were no documents were intentionally false, you may decide that production of the documents would have been unfavorable to Kia."[13]

Higginson was unable to subpoena RFP-verifier Avalos to appear at trial, so the jury heard only portions of her deposition testimony. As noted, the court also excluded the NHTSA Letter and Kia's Response Letter.[14] Therefore, the only evidence the jury heard regarding Kia's RFP responses were excerpts from Avalos's deposition testimony stating that Kia had conducted a diligent search and found no responsive documents, and certain

---

[13] The trial court gave the jury two additional instructions regarding the strength of the parties' evidence. (See CACI No. 203 ["Party Having Power to Produce Better Evidence," which provides: "You may consider the ability of each party to provide evidence. If a party provided weaker evidence when it could have provided stronger evidence, you may distrust the weaker evidence."]); CACI No. 205 ["Failure to Explain or Deny Evidence," which provides: "If a party failed to explain or deny evidence against it when it could reasonably be expected to have done so based on what it knew, you may consider its failure to explain or deny in evaluating that evidence. [¶] It is up to you to decide the meaning and importance of the failure to explain or deny evidence against the party."].)

[14] Higginson does not challenge the trial court's evidentiary rulings.

26

of Higginson's RFPs and Kia's corresponding verified responses claiming that responsive documents never existed.

Based on the court's special jury instruction, Higginson's counsel argued in closing that Kia had "falsified its verification" concerning documents about internal investigations and withheld necessary information. She argued Kia had prevented "crucial evidence from coming out," which kept the jury from seeing Kia's "e-mails and communications with governmental agencies regarding the very defect in [Higginson]'s vehicle and the components that he complained about." Highlighting the court's special instruction on the matter, counsel argued the jury could decide that all of the evidence that Kia withheld would have "been bad for them and would have gone against [Kia's] defense." Finally, she argued that Kia "didn't produce any of the documents related to NHTSA that they say they don't have. But we know that's false."

**D. The Jury's Deliberations and Verdict**

After deliberating for about a half-hour, the jury sent the court a note about the special instruction regarding Kia's RFP responses. The jury asked: "What is the basis of instruction 204.2 being declared false?"

The trial court told counsel: "This note doesn't surprise me. It's actually an obvious note that I was concerned might be asked: 'What is the basis of Instruction 204.2 being declared false?' Well, it's because there are documents that we know of that should have been produced, but I kept those documents out for evidentiary reasons . . . and we didn't admit them into evidence. [¶] . . . [¶] So I thought I could nuance this thing and just make an instruction without . . . letting them see the evidence that supported the instruction."

27

The court concluded it would (and did) answer the jury as follows: "Based upon the applicable rules of evidence, this court cannot answer your question." The court told counsel, "I don't know what else I can do. It's absolutely a good question. It's a question I would ask if I was on that jury, basically, 'What was false about their response? What were the documents that they held back?' "

After deliberating for about half a day, the jury returned a special verdict finding that (1) Higginson had purchased a 2013 Kia Soul distributed by Kia; (2) Kia gave him a written warranty; and (3) the vehicle had a defect covered by the warranty that substantially impaired its use, value, or safety to a reasonable buyer in Higginson's situation. But the jury found that Kia or its authorized repair facility did not fail to repair the vehicle to match the written warranty after a reasonable number of opportunities to do so.

The court entered judgment in Kia's favor.

### E. Posttrial Motions

Higginson moved for a new trial or judgment notwithstanding the verdict (JNOV). He argued, in part, that Kia's withholding of responsive discovery materials constituted an irregularity in the proceedings and discovery abuse warranting terminating sanctions. Higginson reasoned that, had Kia produced its internal investigations into the alleged defect, its rationale for issuing TSBs, customer complaints, and failure rates for the Gamma engine, he "would have had a fair chance" to show the jury that Kia knew the cars were defective when it sold him his car, establishing his fraud claim and entitlement to punitive damages. "After all," he explained, "the NHTSA investigation was prompted by over 200 customer reports of non-crash fires in Kia vehicles . . . and looked into Kia's decision to conduct a safety recall due to a potential risk of fire . . . . There is thus reason to

28

believe Kia withheld documents that could show it was aware 2013 Kia Souls contained an engine that could spontaneously catch fire, at great risk of injury, before it sold the same model to plaintiff that Kia had to repair pursuant to the very fire safety recall NHTSA looked into as part of its investigation." Higginson argued that in a new trial, the court should do one of the following things: "(1) grant JNOV on liability and [hold a trial] solely for a determination of damages; (2) grant a new trial with issue sanctions precluding Kia from contesting the existence of an unfixable defect and Kia's knowledge of that defect at the time it sold the car to plaintiff; or, (3) at a minimum, grant a new trial and once again order Kia to produce all of the relevant documents, so that plaintiff may finally make his case." Higginson also requested "monetary sanctions for the cost of the first trial, since Kia's abuse has required a second trial."

The trial court held extensive proceedings on Higginson's motion. At the initial motion hearing, the court focused primarily on determining when Higginson's counsel learned that it possessed the NHTSA Letter and Kia's Response Letter in any of its files. The court reasoned that even if these letters were in files pertaining to other cases, as "a law firm, . . . any knowledge of your lawyers is imputed to the lawyer handling the case." Higginson's counsel informed the court that they believed they had the NHTSA Letter as early as August 2019 in connection with a case involving Theta II engines. The managing partner surmised his firm first obtained Kia's Response Letter by accessing it from NHTSA's public website a few days or weeks before trial began in this case. The trial court ordered Higginson to submit supplemental briefing confirming these facts.

In a supplemental brief, Higginson's lawyers reported that they searched firm records and determined that Kia first produced the Kia

Response Letter in February and March 2020 in cases involving Theta II engines. Kia produced the letter in those cases subject to protective orders that prohibited their use in other cases without Kia's consent and with heavy redactions of material relating to engines other than the Theta II (like the Gamma engine at issue here). One of Higginson's attorneys also determined he had downloaded the Kia Response Letter from NHTSA's website and saved it on his personal computer in October 2020 in connection with a different case involving the Gamma engine. Higginson's counsel explained to the court that "the firm does not systematically track and compare document productions in different unrelated cases," particularly when those productions are governed by protective orders.

After a follow-up hearing to address the parties' supplemental briefing, the trial court denied Higginson's motions for a new trial and JNOV. The court's written ruling briefly touched on Kia's discovery conduct: "Kia employed a 'search term' approach, that, in retrospect, was destined to discover no responsive documents. It used a conjunctive block search narrative rather than separate search terms, which would result in a positive discovery only if the entire narrative block was found. It was a search strategy that was essentially 'dead on arrival.' "[15]

But the majority of the court's ruling focused on Higginson's counsel's handling of Kia's discovery conduct. First, the court noted that Higginson

[15] The court characterized Kia's conduct less charitably during the hearing, calling it "criminally stupid" and "very stupid to conduct a search . . . in that fashion." The court, admitting it was "purely speculating," imagined that the search might have been done by a paralegal on "her first day on the job." However, Higginson's supplemental submission to the trial court included a declaration by RFP-verifier Avalos from a different case in which she stated she is "a senior litigation paralegal with Kia" and "ha[s] been employed in this role for *more than 16 years.*"

had not made an offer of proof supported by documents showing that "there must have been damaging responsive documents not produced." This gave the court "no way . . . to determine the existence of which . . . documents Kia should have produced to Higginson in pretrial discovery, whether they would have helped or hurt Kia's defense, [or] whether they would even be relevant to Higginson's claim." The court viewed Higginson's argument as "tak[ing] us down a path of pure speculation . . . that the not-produced, responsive documents . . . would have been material, relevant and admissible."

For example, the court reasoned that to the extent Kia's Response Letter revealed the existence of information that occurred after Higginson's purchase and lease, that information would not be relevant to Higginson's fraud claim. Similarly, the court reasoned that "even if [the withheld documents] showed extensive knowledge on the part of Kia of defects in *other* cars, [they] could have played no role in Higginson's lemon law claim" because the jury found — even "without the documents" — "that the vehicle was . . . defective" but that Kia "timely repaired" it, "result[ing] in a 'no liability' finding in the lemon law case."

Second, the court faulted Higginson for "abruptly resurrect[ing] . . . during trial" a "seemingly settled" discovery dispute. In the court's view, Higginson should instead have moved for reconsideration of the discovery issue before Judge Wohlfeil, taken a writ from Judge Wohlfeil's ruling, or raised the issue pretrial in a motion in limine.

Relatedly, "and perhaps most importantly," the court "was greatly concerned" by Higginson's delay in raising the issue, considering that his counsel obtained the NHTSA Letter in 2019 and Kia's Response Letter in early 2020. With that evidence in hand, the court reasoned, Higginson's "counsel could have taken a writ regarding Judge Wohlfeil's decision,

31

propounded an interrogatory specifically requiring Kia to identify the 'search terms' actually used in reaching its conclusion that there were no responsive documents located, taken the deposition of the Kia employee who actually conducted the search, called additional witnesses at trial including the individual who authored [Kia's Response Letter], etc. Instead, they did nothing during the one-year prior to trial."

Regarding the court's grant of Kia's motion for nonsuit on Higginson's fraud claim for a lack of evidence, the court observed that Higginson's "papers failed to point to any admitted evidence that would suggest that the nonsuit should not have been granted." To the extent Higginson blamed Kia for that lack of evidence, the court faulted Higginson's lawyers for failing to "have some pre-filing evidence to support the claim."

Finally, the court was satisfied that instructing the jury with "a special punitive jury instruction" and pattern instructions regarding evidentiary inferences adequately addressed Kia's alleged discovery misconduct.

The trial court thereafter awarded Kia $24,114.63 in prevailing-party costs. The court denied Higginson's motion to tax those costs.

Higginson appeals from the judgment and the postjudgment orders denying a new trial, JNOV, and his motion to tax Kia's costs.

## III.  DISCUSSION

### A.  The Trial Court Acted Within Its Discretion in Denying Terminating Sanctions

Higginson contends the trial court abused its discretion by denying his request for terminating sanctions because that remedy was "*required*" by Kia's discovery misuse. We disagree.

### 1. Relevant Legal Principles

The Civil Discovery Act authorizes sanctions for conduct constituting misuse or abuse of various discovery methods. (*City of Los Angeles v. PricewaterhouseCoopers, LLP* (2024) 17 Cal.5th 46, 61 (*City of Los Angeles*).) Misuses of the discovery process " 'include, but are not limited to,' failures to respond or submit to authorized methods of discovery, making unmeritorious objections without substantial justification, and making evasive responses." (*Id.* at pp. 64–65; see § 2023.010.) Available remedies for discovery misuse include "monetary sanctions, evidentiary sanctions, issue sanctions, and terminating sanctions." (*Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 604 (*Lopez*); see *City of Los Angeles*, at p. 62; § 2023.030, subds. (a)–(d).)

"Courts have articulated two major guidelines for imposing sanctions under . . . the . . . Civil Discovery Act . . . . First, because the very purpose of discovery is to promote the efficient and effective conduct of trial, discovery sanctions are not to be used 'to provide a weapon for punishment, forfeiture and the avoidance of a trial on the merits.' " (*City of Los Angeles*, *supra*, 17 Cal.5th at p. 63; see *Lopez*, *supra*, 246 Cal.App.4th at p. 604 ["The trial court should select a sanction that is ' " 'tailor[ed] . . . to the harm caused by the withheld discovery.' " ' "].) "Second, a more severe sanction is disfavored if a lesser sanction is available." (*City of Los Angeles*, at p. 63; see *Lopez*, at p. 604.)

"This means that a court ordinarily must consider monetary sanctions . . . before it proceeds to consider whether other nonmonetary sanctions are appropriate to address the misconduct at issue." (*City of Los Angeles*, *supra*, 17 Cal.5th at p. 63; see *Lopez*, *supra*, 246 Cal.App.4th at p. 604 ["The discovery statutes . . . 'evince an incremental approach to

discovery sanctions, *starting* with monetary sanctions and *ending* with the ultimate sanction of termination.' "].) Indeed, under the Civil Discovery Act, monetary sanctions are generally considered mandatory, whereas nonmonetary sanctions are discretionary or permissive. (Compare § 2023.030, subd. (a) ["If a *monetary* sanction is authorized by any provision of this title, the court *shall* impose that sanction" (italics added)], with *id*., subd. (b) ["The court *may* impose an issue sanction" (italics added)]; see *City of Los Angeles*, at p. 62 [noting that subds. (b)–(e) of § 2023.030 do not "mandate[] imposition of the[] various nonmonetary sanctions in the same manner as subdivision (a)" makes mandatory the imposition of monetary sanctions].)

"Although in extreme cases a court has the authority to order a terminating sanction as a first measure [citations], a terminating sanction should generally not be imposed until the court has attempted less severe alternatives and found them to be unsuccessful and/or the record clearly shows lesser sanctions would be ineffective." (*Lopez*, *supra*, 246 Cal.App.4th at p. 604.) Further, "[a] trial court must be cautious when imposing a terminating sanction because the sanction eliminates a party's fundamental right to a trial, thus implicating due process rights." (*Ibid*.; see *Moofly Productions, LLC v. Favila* (2020) 46 Cal.App.5th 1, 12 [" 'A decision to order terminating sanctions should not be made lightly.' "].) " 'But where a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction.' " (*Moofly*, at p. 12.)

"A court has broad discretion in selecting the appropriate penalty, and we must uphold the court's determination absent an abuse of discretion."

34

(*Lopez*, *supra*, 246 Cal.App.4th at p. 604.)  Under this standard, " '[w]e will reverse only if the trial court's order was arbitrary, capricious, or whimsical.' " (*Padron v. Watchtower Bible & Tract Society of New York, Inc.* (2017) 16 Cal.App.5th 1246, 1260.)  We " 'resolve all evidentiary conflicts most favorably to the trial court's ruling' " and, " 'where the evidence is in conflict, we will affirm the trial court's findings.' " (*Ibid*.)  The appellant bears the " 'burden to affirmatively demonstrate error.' " (*Ibid*.)

### 2.  Analysis

The question Higginson poses here is *not* whether Kia's conduct presents such an "extreme case" of discovery abuse that the trial court was *allowed* to proceed straight to terminating sanctions.  Instead, Higginson maintains Kia's conduct *required* the trial court to skip over every form of lesser sanction and *begin* with terminating sanctions.  We disagree.

Preliminarily, we are unpersuaded by Higginson's contention that "the trial court applied the wrong standard on willfulness."  Specifically, Higginson argues that "although the trial court agreed that Kia's responses were false and that Kia's search was deficient," the court erred by finding that Kia's conduct was not "willful" because Kia did not act with the "willful intent to deceive."  Higginson misapprehends the trial court's ruling.

The court here did not apply a willfulness standard; rather, the court declined to make a finding on the issue and reserved the issue for the jury.  The court contemplated (in declining to declare a mistrial) that Higginson would "show the jury" his impeachment of Avalos's RFP verification and that the process would "play . . . out in front of the jury."  If the jury found Kia's conduct willful, the court's special instruction would effectuate an issue sanction by allowing jurors to "decide that production of the documents would

35

have been unfavorable to Kia."[16] Our court has approved of issue sanctions that allow for such negative inferences to be drawn from a party's willful failure to produce responsive documents. (See, e.g., *Lopez, supra,* 246 Cal.App.4th at p. 605 ["When a party does not produce ordered documents, the court is entitled to infer the documents would contain evidence damaging to that party's case and instruct the jury accordingly" as an issue sanction].)

The trial court's selection of this remedy for Kia's discovery misuse is further supported by three circumstances that existed when the court ruled. (See *In re Robert A.* (2007) 147 Cal.App.4th 982, 990 ["an appellate court reviews the correctness of a record that was before the trial court at the time it made its ruling"].) First, Kia had not yet definitively revealed that it utilized a deficient conjunctive block-quote search approach. The subsequent revelation of that information shed further light on the inadequacy of Kia's document production and the potential need for a stronger remedy. Second, the trial court had not yet excluded the NHTSA Letter and Kia's Response Letter on evidentiary grounds. As we discuss below (see part III.B., *post*), this development rendered ineffective the court's otherwise-valid incremental discovery sanction and warranted a new trial. Third, Higginson's willingness to accept a mistrial — with *or without* attorney fees incurred thus far — indicates Higginson recognized there were suitable remedies available short of terminating sanctions. That the trial court ultimately selected a different incremental sanction does not change the fact that terminating sanctions were not the only suitable remedy.

---

[16] Although the trial court sometimes referred to the jury instruction as "punitive," we determine from the context of the record as a whole that the court appropriately intended the instruction to be *remedial* rather than *punitive*. (See *City of Los Angeles, supra,* 17 Cal.5th at p. 63 ["discovery sanctions are not to be used 'to provide a weapon for punishment, forfeiture and the avoidance of a trial on the merits' "].)

Higginson's argument that the trial court was *required* to impose terminating sanctions is further undermined by our Supreme Court's recent clarification in *City of Los Angeles* that terminating sanctions — and other *nonmonetary* sanctions — are not statutorily mandated. (*City of Los Angeles*, *supra*, 17 Cal.5th at p. 62.) Indeed, even before *City of Los Angeles*, our court concluded that terminating sanctions are not mandatory even in the face of willful discovery misconduct or disobedience of court orders. (See *Lopez*, *supra*, 246 Cal.App.4th at pp. 605, 606 [holding that a "terminating sanctions order [that] was the *first and only* sanction imposed" for "willfully fail[ing] to comply with [a] document production order" was "premature and unsupported"].)

Higginson argues Kia's conduct here was analogous to that of the auto manufacturer in *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, where the appellate court held that the trial court erred by refusing to impose terminating sanctions when the court learned midtrial that the manufacturer continued to "flagrantly engage[]" in new manners of discovery abuse even after violating four earlier court orders and remaining undeterred by the trial court's escalating monetary and issue sanctions. (*Id*. at pp. 993–994.) But the *Doppes* court acknowledged its holding was "extraordinary" (*id*. at p. 971) and "unprecedented" (*id*. at p. 996). And Higginson cites (and we have found) no case that has followed *Doppes* for this unusual proposition. Significantly, the *Doppes* court concluded terminating sanctions "were imperative" (*id*. at p. 996) only *after* concluding the trial court acted within its discretion when it — like the trial court here — first attempted to remedy the manufacturer's discovery abuse by instructing the jury about that conduct and allowing the jury to draw a negative inference from it (*id*. at p. 994; see *id*. at p. 992 ["The discovery statutes evince an incremental approach to discovery sanctions,

37

starting with monetary sanctions and ending with the ultimate sanction of termination."]; *City of Los Angeles*, *supra*, 17 Cal.5th at p. 63 ["a more severe sanction is disfavored if a lesser sanction is available"]).

In sum, Higginson has not met his burden to show that the trial court abused its discretion by declining to impose terminating sanctions as the first remedy.

## B. The Trial Court Abused Its Discretion by Denying Higginson's Motion for a New Trial

Alternatively, Higginson argues we should "at the very least" direct a new trial and award monetary and other sanctions "necessary to remedy Kia's misconduct." Kia did not address this issue in its respondent's brief.[17] We agree with Higginson that Kia's discovery misuse constitutes an irregularity in the proceedings that denied him a fair trial. Accordingly, he is entitled to a new trial.

Section 657, subdivision (1) authorizes a trial court to grant a new trial when there has been an "[i]rregularity in the proceedings of the court, jury or adverse party . . . by which either party was prevented from having a fair trial." "[T]he denial of a motion for new trial is reviewed for abuse of discretion, with the appellate court making an independent determination as to whether any error was prejudicial." (*Argueta v. Worldwide Flight Services, Inc.* (2023) 97 Cal.App.5th 822, 832.)

As he did in the trial court, Higginson here relies heavily on *Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152 (*Sherman*), which we

---

[17] "We nevertheless consider the point because a respondent's failure to address an issue raised in the opening brief is not a concession." (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 557, fn. 48.)

find instructive. In *Sherman*, the product-liability defendant's document production included only three incident reports regarding the subject product. (*Id*. at p. 1157.) During closing argument, defense counsel emphasized the limited number of incidents and reassured the jury that the defendant had produced all responsive documents during discovery. (*Id*. at p. 1158.) After a five-week trial, the jury deliberated for only 45 minutes before returning a defense verdict. (*Ibid*.)

The *Sherman* plaintiffs "moved for a new trial on the grounds of irregularity in the proceedings and newly discovered evidence." (*Sherman*, *supra*, 67 Cal.App.4th at p. 1159.) The plaintiffs "claimed that one week after the verdict, they learned for the first time [the defendant] had falsely answered discovery inquiries and 'intentionally failed to disclose highly relevant and material information and documents directly bearing on the fundamental issues of this action.'" (*Ibid*.) The plaintiffs received "a fluke phone call from a Texas attorney" (*id*. at p. 1162) who had litigated against the same defendant and obtained 24 incident reports regarding the product at issue in the *Sherman* plaintiffs' case (*id*. at p. 1159). The Texas attorney provided those reports to the *Sherman* plaintiffs. (*Ibid*.) The plaintiffs asserted in their new trial motion that the "newly discovered evidence was requested in discovery, but [the defendant] had denied its existence" and "misled the jury into believing mishaps were infrequent." (*Ibid*.)

The *Sherman* defendant opposed the motion, explaining it withheld certain of the reports because it deemed them irrelevant, and others because they "were inadmissible for one reason or another." (*Sherman*, *supra*, 67 Cal.App.4th at p. 1159.) The defendant also argued any "nonproduction was immaterial" because the plaintiffs introduced evidence of incidents beyond the three documented in incident reports; accordingly, the

39

"introduction of a few more incident reports would have been cumulative and unlikely to make any difference in the outcome." (*Id*. at pp. 1159–1160.)

"The trial court accepted [the defendant]'s no-harm, no-foul argument" and denied the plaintiffs' new trial motion. (*Sherman*, *supra*, 67 Cal.App.4th at p. 1160.) The court reasoned that " 'the jury was out only 45 minutes' " and the nonproduced documents, if anything, helped the defendant because they largely related to different mechanisms of injury than the *Sherman* plaintiffs' suffered. (*Ibid*.)

The *Sherman* court reversed. Focusing on the materiality of the withheld evidence, the court observed that whereas "[t]he jury knew directly about only three incidents, . . . there were *at least eight times that many incident reports!*" (*Sherman*, *supra*, 67 Cal.App.4th at p. 1161.) The court found not only that the "sheer number of documents" was "itself of ponderable significance" (*ibid*.), but also that the nonproduction prevented the plaintiffs from both "obtaining the information contained in the reports" and "from following up" on it (*id*. at p. 1162). The *Sherman* court observed that the defendant's "concealment of the subject documents deprived the [plaintiffs] of the chance to tell the jury the whole story" (*ibid*.) and deprived the jury of the "chance to evaluate liability against the backdrop of the big picture" (*id*. at p. 1155). Under these circumstances, the *Sherman* court held that the plaintiffs "were entitled to a new trial on the ground of irregularity in the proceedings preventing them from obtaining a fair trial" (*id*. at p. 1162, fn. 5, citing § 657, subd. (1)) and on the ground of newly discovered evidence (*id*. at p. 1162; see § 657, subd. (4)).

The *Sherman* court also found that the defendant's "continuing disregard of its discovery obligations" and "its witnesses' utter lack of candor, if not outright lies, at trial" (*Sherman*, *supra*, 67 Cal.App.4th at p. 1162)

40

"subverted justice" (*id.* at p. 1156) and necessitated the imposition of monetary sanctions "in an amount *at least* sufficient to compensate the [plaintiffs] for the costs, including attorney fees, of the first trial" and "their costs on appeal" (*id.* at p. 1164).  The *Sherman* court explained that it published its opinion "to send a loud and clear message to litigants and counsel alike" that the courts "will not tolerate the disgraceful tactics" at issue in the case and "to ensure that any victory achieved by such methods . . . will be short-lived and costly."  (*Id.* at p. 1156.)

As in *Sherman*, several considerations persuade us that Kia's discovery misuse constitutes an irregularity in the proceedings that prevented Higginson from having a fair trial.

First, it is essentially undisputed that Kia withheld responsive discovery on the alleged engine defects and falsely verified that such documents "never existed."[18]  Indeed, even after extensive discovery litigation and posttrial motion practice in the trial court, Kia still has not produced responsive documents (beyond the service and warranty histories of Higginson's own vehicle and certain TSBs).  This deprived Higginson of essential discovery critical to all aspects of his case.  For example, Higginson showed in connection with his new trial motion that Kia's document production in similar consumer litigation amounted to about 1.8 million pages.  "The sheer number of documents is itself of ponderable significance, and may explain [Kia]'s great efforts to conceal this evidence." (*Sherman*, *supra*, 67 Cal.App.4th at p. 1161.)

---

[18]    Most obviously, Higginson's RFP No. 56 requested communications between Kia "and any government agency or entity," such as NHTSA.  The NHTSA Letter and Kia's Response Letter are both clearly responsive to this request, yet Kia did not produce either document to Higginson in this case.

Kia effectuated its nonproduction by giving an unduly narrow and unreasonable "conjunctive" reading to the court-adopted definition of "engine defects." At best, this misreading was negligent. And the record suggests it was worse than that. Kia ignored Higginson's repeated efforts to meet and confer regarding search terms. Kia's verifier testified falsely in her deposition that Kia usually searches both conjunctively and disjunctively and that the search here was done diligently and in accordance with Kia's usual practice. Kia's counsel consistently dodged the trial court's attempts to pin down Kia on the search terms it used; Kia only finally admitted midtrial that it searched conjunctively for records that included the entire list of symptoms.[19] Although the trial court did not find Kia's conduct regarding search terms was "willful," the court characterized it unfavorably, calling it "criminally stupid"; a "garbage argument"; "not a fair" or "reasonable reading"; "destined to discover no responsive documents"; " 'dead on arrival' "; and an approach that "make[s] no sense" and which "no judge would have" intended. Under *Sherman,* it is our obligation "to ensure that any victory achieved by such methods and challenged in this court will be short-lived and costly." (*Sherman, supra,* 67 Cal.App.4th at p. 1156.)

Second, although we concluded above (see part III.A.2, *ante*) that the trial court's selection of an issue sanction instead of a terminating sanction was a reasonable choice when the court made it, it became clear by the conclusion of trial that the jury instruction given on Kia's discovery misuse was ineffective and deprived Higginson of a fair trial. That is, because the court excluded the NHTSA Letter and Kia's Response Letter, and because

19    This belies Kia's disingenuous claim in its appellate briefing that Higginson "misrepresent[ed]" in his opening brief that Kia admitted it used a conjunctive search term. As set forth in our factual summary (see part II.C.6., *ante*), the record shows that Kia undeniably admitted this fact.

Kia invoked the protective orders in other cases to preclude their use in this case of Kia's document productions in those cases, the jury had no way of knowing what documents Kia failed to produce or why its verification was false. No other evidence was presented to the jury about Kia's Response Letter or the documents referenced in and attached to it. The jury therefore had no way of knowing anything about what Kia withheld or why it did so.

Predictably, the jury expressed confusion and asked immediately after beginning deliberations what was false about Kia's discovery responses. The court was not surprised by the jury's "obvious note," which asked a question the court "would ask" if it were on that jury. The court "thought [it] could nuance this thing and just make an instruction without . . . letting [the jury] see the evidence that supported the instruction." Yet, the court responded to the jury's note by saying that it "cannot answer your question." Even Kia conceded in its opposition to the new trial motion that the instruction essentially required the jury to "speculate" as to the content of the missing discovery. On this record, the only reasonable conclusion is that the jury instruction ultimately proved inadequate to remedy Kia's discovery violation and to safeguard Higginson's right to a fair trial — just as he argued in his new trial motion.

Third, the trial court unduly focused on Higginson's alleged lack of diligence in uncovering Kia's discovery misuse rather than on Kia's discovery misuse itself. Yet, neither the trial court nor Kia cited any authority holding that a party's delay in proving the other side's egregious discovery violation is a relevant factor to consider in determining the appropriate relief. Indeed, while the new trial statute includes a diligence requirement for motions premised on newly discovered evidence, the statute does not impose such a requirement for motions premised on irregularities in the proceeding.

43

(Compare § 657, subd. (4) [authorizing a new trial based on "[n]ewly discovered evidence, material for the party making the application, which he could not, *with reasonable diligence*, have discovered and produced at the trial" (italics added)] with *id.*, subd. (1) [authorizing a new trial based on "[i]rregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial"].)

In any event, on our independent review of the record, the totality of the circumstances show that Higginson was diligent enough. He proactively sought to meet and confer with Kia regarding search terms. He proposed a narrowed definition of "engine defects" that the trial court adopted. He filed a motion to compel further responses when Kia served boilerplate objections. He moved to compel compliance with Judge Wohlfeil's discovery order when Kia persisted in asserting objections even after the judge ordered that Kia respond "without objection." Once Kia supplemented its responses with code-compliant assertions that responsive documents "never existed," Higginson was entitled to rely on that response. (See *Pate v. Channel Lumber Co.* (1997) 51 Cal.App.4th 1447, 1454–1455 [when a party has served verified responses confirming that no responsive documents exist, the opposing party need not pursue a futile motion to compel before seeking an evidentiary sanction during trial to exclude the introduction of unproduced, responsive documents].)

The trial court faulted Higginson for not filing a motion for reconsideration before Judge Wohlfeil. But Higginson had no new or different evidence on which to base such a motion. (See § 1008, subd. (a) [authorizing a motion for reconsideration "based upon new or different facts, circumstances, or law"].) Higginson had already submitted the NHTSA

44

Letter with his motion to support the inference that because NHTSA had requested documents like those that Higginson requested, then responsive documents likely existed. But even in the face of that evidence and inference, Kia persisted in asserting under penalty of perjury that no responsive documents ever existed. Thus, there was nothing for Judge Wohlfeil to reconsider.

Nor, similarly, was there any error by Judge Wohlfeil for Higginson to challenge via writ review, as the trial court also suggested. (See *Venture Law Group v. Superior Court* (2004) 118 Cal.App.4th 96, 101 ["writ review of discovery orders is disfavored" unless a "petitioner seeks extraordinary relief from a discovery order that may undermine a privilege"].) Indeed, Judge Pollack at one point acknowledged that "if your response is '[documents] don't exist,' a judge ruling on a motion to compel . . . has no choice but to deny the motion." If Judge Wohlfeil could not have ruled differently, there was no error for an appellate court to correct.

To the extent the trial court faulted Higginson for not seeking relief based on his counsel's possession of Kia's Response Letter in connection with other cases, the court imposed an unreasonable one-sided burden only on Higginson. On one hand, the trial court speculated that Kia's false verification and nonproduction of documents may have resulted from a "left hand . . . right hand" situation or a day-one paralegal.[20] Yet, the trial court showed no similar grace for Higginson's counsel, instead expecting that they would immediately recognize the importance to *this* case of documents produced in *other* unrelated cases and subject to protective orders that Kia

---

[20]    As noted, the record shows that Avalos had been a senior litigation paralegal at Kia "for more than 16 years."

invoked in this case.[21]  Indeed, Higginson's counsel explained to the trial court that their firm does not track document productions across different cases, particularly when those productions are governed by protective orders. It was only when the firm's managing partner — with broader experience and knowledge of the firm's case load — became involved on the literal eve of trial that Higginson's legal team appreciated the significance to this case of documents obtained in unrelated litigation.  By contrast, Kia offered *no evidence* explaining why it had produced the Kia Response Letter in other cases but not this one.  The trial court abused its discretion by unreasonably expecting the litigant to make inferential leaps of logic while the court made speculative excuses for the party committing inexcusable discovery misuse.

The trial court also unreasonably expected Higginson to pursue additional discovery from Kia regarding its search terms and document collection process, even after Kia had refused to meet and confer on the topics, its paralegal had testified in deposition that Kia used a conjunctive *and* disjunctive search protocol, and Kia and its trial counsel repeatedly assured Higginson *and the trial court* that no responsive documents existed.

Fourth, the trial court characterized Higginson's argument for a new trial as "pure speculation" as to what the wrongfully concealed documents would have disclosed.  But Higginson was forced to speculate only because Kia never — *and still has not* — produced responsive documents.  Courts have recognized that a party from whom discovery has been wrongfully withheld will be unable to prove the contents of the wrongfully withheld discovery.  (See *Electronic Funds Solutions, LLC v. Murphy* (2005)

[21]    Notably, when Higginson's trial counsel said on the first day of trial that she had all the documents she needed, Kia's attorney responded by noting that Higginson's use of documents governed by a protective order in another case "was probably a violation of that protective order."

134 Cal.App.4th 1161, 1184 [holding that a party seeking sanctions for discovery abuse need not show prejudice arising from a responding parties' destruction of responsive evidence because the responding parties' "own actions make that showing difficult, if not impossible"]; *Siry Investment, L.P. v. Farkhondehpour* (2020) 45 Cal.App.5th 1098, 1122 ["A prejudice requirement [for discovery sanctions] would be 'difficult,' if not 'impossible,' for a propounding party to meet because a showing of prejudice would likely turn on the significance of the information that the noncompliant party is refusing to disclose.  [Citation.]  A prejudice requirement would also empower intransigent parties to continue their intransigence on the ground that the documents they were withholding are not that important."].)[22]

Kia denied Higginson a fair trial by withholding all discovery on the engine defects at issue and by falsely asserting under oath that it had no responsive documents.  Kia continued to withhold the documents at trial.  Because Kia bears the responsibility for creating this evidentiary vacuum, it cannot escape the consequences simply because its own conduct resulted in that vacuum.  Indeed, to overcome such an evidentiary vacuum, the law allows us to reasonably infer that Kia withheld these documents because they would have been damaging to its defense.  (See *Lopez*, *supra*, 246 Cal.App.4th

_____

[22]    Although these cases involve prejudice in the context of discovery sanctions, Higginson cites *Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1114 to support the broader proposition that "[a]n error is reversible per se where it deprives a party 'of a fair hearing and the opportunity to show actual prejudice.' "  (See also *In re Christopher L.* (2022) 12 Cal.5th 1063, 1073 ["not all errors are amenable to harmless error analysis"; some " 'by their nature, result in a "miscarriage of justice" ' "].)  Despite Higginson citing these authorities in his opening brief on appeal, Kia did not address them in its respondent's brief.  We need not conclude here whether the trial court's denial of a new trial was reversible per se because, as we explain below, Higginson has demonstrated prejudicial error.

at p. 605 ["When a party does not produce ordered documents, the court is entitled to infer the documents would contain evidence damaging to that party's case and instruct the jury accordingly."]; *Sherman*, *supra*, 67 Cal.App.4th at p. 1162 [positing that the "sheer number of [withheld] documents is itself of ponderable significance, and may explain [the responding party]'s great efforts to conceal this evidence"].)

Fifth, we note that the trial court's own speculation that the withheld discovery could *not* have altered the result is, itself, unsupported. For all we can tell, the withheld discovery could have disclosed that the vehicle had a more serious and more irremediable defect than the jury believed it did. Thus, while the jury may have found — on the limited evidence presented at trial — that Kia repaired the defect in Higginson's car, the withheld documents may have persuaded the jury that Kia's repairs "provided temporary relief . . . but never resolved [the] fundamental defect." (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 135.) And because Kia wrongfully withheld discovery, "the jury never had a chance to evaluate liability against the backdrop of the big picture." (*Sherman*, *supra*, 67 Cal.App.4th at p. 1155.)

Indeed, because of Kia's discovery misuse, we cannot determine exactly what the big picture would have revealed. This is precisely why the trial court abused its discretion in finding that the withheld discovery could not have made a difference to the outcome of the case. But by reasonably inferring that the withheld documents would have supported Higginson's case (see *Lopez*, *supra*, 246 Cal.App.4th at p. 605; *Sherman*, *supra*, 67 Cal.App.4th at p. 1162), we conclude there is at least a reasonable probability the jury would have reached a different result (or the court would not have granted nonsuit on the fraud claim) if Higginson had been able to

use the documents Kia sent to NHTSA in response to 244 complaints of non-crash fires that were preceded by engine issues similar to those experienced by him, such as engine knock, noise, sputtering, or stalling.[23] The mere fact that Higginson himself had not yet experienced a damaged catalytic converter or a non-crash fire does not mean his vehicle did not have an engine defect under investigation by NHTSA. On this point, Higginson's expert testified that "[i]f the problems that [Higginson] complained about during the repair history were left untreated and not repaired, . . . there [is] a potential that [his car] could catch on fire" — that is, suffer a non-crash fire.

Finally, we note that when this issue arose during trial, Judge Pollack initially proposed to declare a mistrial, order Kia to pay Higginson's costs and attorney fees for the trial up until then, and to set a new trial once Kia produced documents. Higginson was willing to accept this proposal, *even without payment of his attorney fees*. But Kia's counsel continued to insist it had done nothing wrong and that Higginson was merely rehashing old discovery disputes. The trial court's decision to instead instruct the jury regarding the discovery issue may have been a reasonable alternative when the court made its decision. Indeed, in doing so, the trial court implicitly acknowledged the irregularity of the proceedings to that point. But subsequent events — namely, the trial court's exclusion of the NHTSA Letter and Kia's Response Letter, and Kia's definitive confirmation that it used an improper conjunctive search term (a predicament that could easily have been avoided had Kia simply accepted Higginson's invitation to meet and confer

---

[23]    Moreover, while the trial court focused on the limited universe of NHTSA-related documents, the record indicates Higginson's discovery requests were broader than NHTSA's investigatory requests (e.g., by also requesting Kia's email communications). Thus, the broader universe of withheld documents here supports an even broader inference of their harmfulness to Kia's case.

regarding search terms) — rendered the trial court's selected remedy inadequate to protect Higginson's right to a fair trial.

We therefore conclude that the trial court's original proposed remedy was the right one all along. We will implement it now by ordering a new trial, with directions that the trial court impose monetary sanctions on Kia for the costs (including attorney fees) of the trial and this appeal. (*Sherman*, *supra*, 67 Cal.App.4th at p. 1164 [reversing defense judgment due to discovery violation and directing trial court to order monetary sanctions to compensate plaintiffs for costs and fees of first trial].) In doing so, we are merely fulfilling Judge Wohlfeil's prediction during the initial discovery dispute that, if Kia "got away with one today, . . . eventually the court will figure that out, and there will be a way of balancing the scales of justice."

## C. The Trial Court Erred by Denying Higginson Leave to Amend to Attach the Required CLRA Venue Affidavit

The CLRA requires that a plaintiff file, "concurrently with the filing of the complaint, . . . an affidavit stating facts showing that the action has been commenced in a" proper venue. (Civ. Code, § 1780, subd. (d).) "If a plaintiff fails to file the [required] affidavit . . . , the court shall . . . dismiss the action *without* prejudice." (*Ibid.*, italics added.)

As noted, when the trial court sustained Kia's demurrer to Higginson's CLRA cause of action based on his failure to file the required venue affidavit concurrently with his original complaint, the court did so "*without* leave to amend." Higginson contends the trial court should either have (1) overruled the demurrer because Higginson filed a venue affidavit before (but not "concurrently with") the amended complaint that was the subject of Kia's

50

demurrer; or (2) sustained the demurrer with leave to amend, as required by Civil Code section 1780, subdivision (d).[24]

Because Higginson failed to file the required affidavit "concurrently with" his original or amended complaint, the trial court properly sustained the demurrer on that ground. But the trial court erred by doing so without granting Higginson the statutorily required leave to amend to overcome the purely technical pleading defect. On remand, the trial court is directed to vacate its order sustaining Kia's demurrer without leave to amend as to the venue affidavit, and to enter a new order sustaining the demurrer with leave to amend as to the venue affidavit.

## D. Because the Judgment Is Reversed, so Too Is the Postjudgment Order Awarding Kia Its Prevailing-party Costs

Higginson argues that we should also reverse the trial court's order denying his motion to tax Kia's prevailing-party costs. We agree. " 'An order awarding costs falls with a reversal of the judgment on which it is based.' " (*Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1284; see *Evans v. Southern Pacific Transportation Co.* (1989) 213 Cal.App.3d 1378, 1388 ["Because the award of costs to defendant was incident to the judgment, reversal of the judgment operates to vacate the award."].)

---

24    Kia argues Higginson forfeited this challenge by failing to first raise it in the trial court. Because Higginson's challenge raises a pure question of law, we decline Kia's invitation to deem the issue forfeited. (See *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24 [an appellate court has the discretion to address an issue of law based on undisputed facts "even though it had not been raised in the trial court"].)

### E. Higginson's Request for Judicial Notice Is Denied

Higginson requests that we take judicial notice of publicly filed court papers from three cases: *Whitlow v. Kia Motors America, Inc.* (Super. Ct. Sac. County, 2022, No. 34-2019-00253447) (Exhibit A); *Valdovinos v. Kia Motors America, Inc.* (Super. Ct. L. A. County, 2022, No. 19STCV07491) (Exhibits B–J); and *In re: Hyundai and Kia Engine Litigation II* (C.D. Cal., No. 8:18-cv-02223-JLS-JDE) (Exhibits K & L). He argues the documents show Kia's positions taken in other similar litigation, its discovery misconduct, and its knowledge of the existence of responsive documents. He further maintains that they show Kia cannot be trusted to produce documents even if ordered to do so on remand. According to Higginson, he presented some of these documents (Exhibits A, E, F, & K) to the trial court in connection with his posttrial motions, but the court rejected them because they were not filed with leave of court. Others (Exhibits B–D, G–J and L) were not previously presented to the trial court.

We deny the request for several reasons. To begin, the record reflects that Higginson sought to file this additional evidence *after* the trial court had announced its decision on his motions for new trial and JNOV. The trial court then struck the evidence from the record, stating it did not consider the unpermitted filings. Ultimately, none of the subject documents became part of the record in this case. Typically, when reviewing the correctness of a judgment, we consider only matters that were part of the record at the time the court entered the judgment. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.) " 'This rule preserves an orderly system of [litigation] by preventing litigants from circumventing the normal sequence of litigation.' " (*Ibid.*) Thus, absent exceptional circumstances, we do not

take judicial notice of matters not before the trial court. (*Ibid.*) We find no exceptional circumstances here.

Further, while a court may judicially notice the "[r]ecords of . . . any court of this state" (Evid. Code, § 452, subd. (d)), that extends only to "the truth of the results reached—in documents such as orders, statements of decision, and judgments—but [not to] the truth of hearsay statements in decisions or court files, including pleadings, affidavits, testimony, or statements of fact." (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 130, fn. 7; see also *South Lake Tahoe Property Owners Group v. City of South Lake Tahoe* (2023) 92 Cal.App.5th 735, 752 ["Courts may not take judicial notice of allegations in affidavits, declarations and probation reports in court records because such matters are reasonably subject to dispute and therefore require formal proof"].) Of the documents Higginson asks us to judicially notice, only two are court orders (Exhibits C & H), and neither of those documents were before the trial court when it made its posttrial rulings.

We need not further analyze the matter, because given our disposition, the documents are not relevant. (See *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 687, fn. 10 [reviewing courts " 'may decline to take judicial notice of matters that are not relevant to dispositive issues on appeal' "].)

53

## IV. DISPOSITION

The judgment is reversed.

The trial court is directed to vacate its order denying Higginson's motion for new trial and to enter a new order granting a new trial. The trial court is further directed to order sanctions in favor of Higginson and against Kia in an amount at least sufficient to compensate Higginson for the costs, including attorney fees, of the first trial and this appeal. The court may exercise its discretion to determine whether additional sanctions are warranted.

The trial court is also directed to vacate its order sustaining without leave to amend Kia's demurrer to Higginson's seventh cause of action for violation of the CLRA, and to enter a new order sustaining with leave to amend Kia's demurrer to that cause of action.

The postjudgment order awarding Kia its prevailing party costs is vacated incident to reversal of the judgment.

54

RUBIN, J.

I CONCUR:

BUCHANAN, J.

O'Rourke, Acting P. J., Dissenting

I respectfully dissent. A trial court's exercise of discretion on a new trial motion "is given great deference on appeal." (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872.) Additionally, only "prejudicial error is the basis for a new trial"; "there is no discretion to grant a new trial for harmless error." (*Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1161; *Jenks v. DLA Piper Rudnick Gray Cary US LLP* (2015) 243 Cal.App.4th 1, 8 [denial of a "motion for new trial will not be set aside unless there was an abuse of discretion that resulted in prejudicial error"].) This standard conforms to article VI, section 13 of the California Constitution: "No judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." A miscarriage of justice occurs only if " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

The majority opinion contravenes these standards. Higginson argues and the majority holds that a new trial is warranted by Kia's discovery misconduct and failure to produce evidence, which assertedly constitutes an "[i]rregularity in the proceedings of the . . . adverse party . . . by which [Higginson] was prevented from having a fair trial." (Code Civ. Proc., § 657, subd. (1).) The trial court rejected Higginson's position. On this record the court did not exceed the bounds of reason in denying Higginson a new trial.

The purpose of the sought-after discovery was to obtain documents reflecting alleged engine defects in Higginson's model of vehicle. And the

jury made the adverse finding Higginson wanted for Kia's discovery abuse—that his vehicle had a defect covered by the warranty. It nevertheless found Kia did not fail to repair the defect, defeating Higginson's Song-Beverly Consumer Warranty Act (Song-Beverly) cause of action. (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1101 [elements of Song-Beverly claim include that "the manufacturer or his representative did not repair the [substantially impairing] nonconformity after a reasonable number of repair attempts"]; *Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 798.) In short, because substantial evidence supports that finding, the court did not abuse its discretion to deny a new trial for Kia's asserted discovery misconduct that did not result in a miscarriage of justice.

I reject the majority's assertion that reversal is warranted. As a procedural matter, a new trial motion for irregularity of the proceedings under Code of Civil Procedure section 657, subdivision (1) is unavailable here, where the claimed "[i]rregularity" was fully known by Higginson *before* the trial concluded. An "irregularity in the proceedings" refers to "matters which appellant *cannot fully present by exceptions taken during the progress of the trial . . . .*" (*Gibbons v. Los Angeles Biltmore Hotel Co.* (1963) 217 Cal.App.2d 782, 791-792, italics added; see also *Montoya v. Barragan* (2013) 220 Cal.App.4th 1215, 1229-1230.) The majority says the trial court erred by expecting Higginson's counsel to "immediately recognize the importance to *this* case of documents produced in *other* unrelated cases and subject to protective orders that Kia invoked in this case." But Higginson's counsel *did in fact* recognize the significance of such documents years before trial. In his July 2021 opposing summary judgment declaration, Higginson's attorney Matthew Pardo sought a continuance to obtain additional discovery,

2

asserting that Kia had failed to produce relevant discovery: documents and witnesses concerning its internal knowledge of defects with the Gamma engine and related components such as the catalytic converter. His declaration is replete with references to missing discovery; he referenced not only the April 2019 NHTSA letter to Kia concerning "fire propensity and engine malfunction in 2013 Kia Soul vehicles equipped with Gamma engines" but a court order from a Los Angeles County case (*Maria I Torres v. Kia Motors America, Inc.,* Super. Ct., L. A. County, 2022, No. 18STCV00967) assertedly showing "concrete examples of [Kia's] fraudulent conduct and awareness of engine defects in its vehicles." He pointed out that in April 2019 and February 2020 Kia had issued a safety recall and a product improvement campaign acknowledging engine defects in the Gamma engine type in 2013 Kia Souls. Counsel asserted there was good cause to believe Kia was withholding relevant discovery.

1 The record thus contradicts Higginson's counsel's mid-trial assertion to the trial court that his associates did not track document productions across different cases. Yet the majority holds the trial court abused its discretion by unreasonably expecting Higginson to make "inferential leaps of logic . . . ." (Maj. opn., *ante*, at p. 47.) On this record, no inferences or leaps were

---

1      Attorney Pardo also referenced a November 2020 consent order between NHTSA and Kia in an investigation involving a different engine (Theta II), in which Kia had made "a voluminous production of information . . . ." (Underlining omitted.) Counsel said in part: "It is apparent . . . that documentary evidence exists of [Kia's] fraudulent concealment of defects in its engines, including multiple engine types."

necessary: attorney Pardo fully appreciated Kia's discovery failings months if not years before the November 2022 trial.[2]

Nor is this a situation where Higginson lacked the opportunity to uncover the withheld information. Notably, Pardo admitted in supporting Higginson's new trial motion that as of *October 15, 2020*, he first became aware of a public copy of Kia's June 2019 response to the NHTSA in connection with another case involving the *same year make and model vehicle* as Higginson. And in April 2021, Higginson's counsel deposed Kia's "person most qualified." Though the deposition notice initially sought information about the incidence and symptoms of defined engine defects as well as Kia's "awareness of these issues in 2013 Kia Soul vehicles over time," Higginson ultimately agreed to withdraw technical issues pertaining to engine defects as well as topics related to paralegal Deborah Avalos's search for documents, which presumably would have included the terms actually used by Kia. As the majority points out, that stipulation was without prejudice to Higginson's right to additional discovery, which he apparently did not pursue. The court acknowledged Higginson's lack of diligence in this respect during mid-trial discussions of the issue: "The issue here is every argument that you're now making today could have been made three months ago; right? In other words it's not like I had thought; and that was that you found out about documents that were produced in another case that caused you to say, wait a minute.

---

[2] Yet, the majority repeat Higginson's erroneous claim by stating that "[o]n the eve of trial (before a different judge), Higginson's counsel found on NHTSA's public website a letter from Kia agreeing to produce records in response to NHTSA's [April 2019] investigation . . . ." Notably when Higginson's trial attorney raised the discovery issue at the outset of trial, the trial court asked: "I need to know. Do you have what you need to prove your case against [Kia]?" Counsel responded, "We have the documents here, yes." It was not until the midst of trial that the managing partner walked back that assertion.

They were lying. You knew they were lying as of the time, for the very reasons you've told us; right?" Higginson's counsel, the managing partner of Pardo's law firm, falsely responded that his attorneys "did not look at this production that they had made to us in this other case . . . ." He then explained that it was because he was the managing partner that he began reviewing NHTSA investigations concerning not just Kia Souls but other vehicles, and he would have brought it up earlier; that his associates "don't know that people lie in verified responses," and relied on Kia's verification. The trial court mentioned the lack of diligence in denying Higginson a new trial, finding Higginson's law firm "had the very NHTSA correspondence upon which the motion for new trial and JNOV is fundamentally premised long before through its discovery in other cases or based upon its own research on the publicly available NHTSA website."

Because the claimed irregularity was known to Higginson and his counsel before the trial concluded, it *was* a matter that he could " 'fully present by exceptions taken during the progress of the trial.' " (*Montoya v.*

3

*Barragan, supra*, 220 Cal.App.4th at p. 1230.)[3] And Higginson did so, calling the issues to the trial court's attention and leading the jury to find in keeping with the court's punitive jury instruction that his vehicle had a defect. The sought-after discovery was focused on ascertaining defects in Higginson's vehicle, and the jury made that finding. The majority's assertion that the trial court's chosen remedy was ineffective is flatly contradicted by the jury's verdict.

The jury went on to find Kia *repaired* the vehicle. That finding, which as stated above is fatal to Higginson's Song-Beverly claim, is amply supported by the trial evidence. The parties presented competing experts on Higginson's complaints about his vehicle based on the repair orders and whether the defects had been repaired. Kia's expert, who had inspected the vehicle in July 2021 when it had approximately 139,000 miles on it, testified that at the time, the catalytic converter was working efficiently and the car had no active or historic fault codes, check engine lights, or other warning lights. He had no difficulty steering the vehicle. He found no active or

---

[3]  This distinguishes these circumstances from those in *Sherman v. Kinetic Concepts, Inc.*, *supra*, 67 Cal.App.4th 1152, on which the majority relies, including to award attorney fees as monetary sanctions. In *Sherman*, it was *after trial* that the plaintiffs received counsel's "fluke" call concerning the defendant's concealment of documents. (*Sherman*, at pp. 1159, 1162.) Higginson's new trial motion is in substance one based on newly discovered evidence. But even so classified it would fail because, as the majority recognize, the evidence must be such that the moving party "could not, with reasonable diligence, have discovered and produced [it] at the trial." (Code Civ. Proc., § 657, subd. (4); see *Sherman*, at p. 1161.) While Higginson made efforts early on to purse and compel discovery from Kia, the court would have properly found he lacked diligence once he eliminated critical inquiries from the deposition of Kia's person most knowledgeable, despite knowing responsive documents had to exist concerning asserted defects in Gamma engines. Imposition of monetary sanctions under the circumstances of this case is unjust. (Code Civ. Proc., § 2023.030, subd. (a).)

4

historical codes indicating carbon buildup. While he heard some creaking noise while steering, he explained it was the car's strut tower mounts, which could be solved if Higginson paid to replace them. Higginson's expert acknowledged he had not seen any catalytic converter or overheating issues in Higginson's car, and agreed the car did not catch on fire. Though Higginson's expert described Kia's cylinder head repair effort as a "band-aid" that did not diagnose or resolve the cause of carbon buildup, the jury rejected that testimony. It likewise assessed Higginson's demeanor when he testified that he was still experiencing knocking after that repair and rejected the assertion. The jury's repair finding, which Higginson does not challenge on appeal, is supported by Kia's expert's testimony. Courts must uphold findings supported by the evidence " 'even though substantial evidence to the contrary also exists and the [trier of fact] might have reached a different result had it believed other evidence.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640.)

The majority says Kia denied Higginson a fair trial by withholding all discovery on the engine defects at issue. But assuming the unproduced documents would have shown Higginson's car had a "nonconformity covered by the express warranty that substantially impaired the use, value or safety of the vehicle" (*Oregel v. American Isuzu Motors, Inc., supra*, 90 Cal.App.4th at p. 1101), as stated, the jury made that finding adverse to Kia. The majority also faults the trial court's reasoning as to counsel's diligence and whether any withheld documents could have altered the result. But the court had it right. The court correctly found Higginson's attorneys possessed the NHTSA correspondence Higginson raised as a basis for his new trial and JNOV motion more than one year before the trial began, and reasoned counsel should have dealt with it then. The court observed that Higginson's

5

counsel had various options to address the matter pretrial, but did not do so, instead bringing an "untimely motion for directed verdict and terminating sanctions" after trial had commenced.[4]  It also found Higginson's arguments about Kia's failure to produce documents amounted to "pure speculation, *i.e.,* speculation that the not-produced, responsive documents would have proven that Kia knew of defects that it was either unwilling or unable to fix . . . and that such documents would have been material, relevant and admissible."

The majority itself speculates that the withheld discovery could have disclosed Higginson's vehicle had "a more serious and more irremediable defect than the jury believed it did."  For his part, Higginson argues the jury's decision could have changed had it seen "internal documents showing Kia was aware of a pervasive, *unfixable* defect in Gamma engines . . . ."  But the documents assertedly withheld by Kia as evidenced by the April 2019 NHTSA investigation pertained to customer reports or allegations of non-crash fires originating or possibly originating in the engine compartment, either caused, possibly caused, or not caused by engine failures.  As the trial court observed in denying a new trial, Higginson did not allege his vehicle

---

[4]     The trial court explained Higginson had options beyond taking a writ: "It is important to recognize that irrespective of Kia's inadequate response and Judge Wohlfeil's rulings, plaintiff's counsel had to have known that Kia's search was inadequate since plaintiff's counsel already had the NHTSA correspondence with Kia, in spite of it not having been produced to them by Kia.  Plaintiff's counsel could have taken a writ regarding Judge Wohlfeil's decision, propounded an interrogatory specifically requiring Kia to identify the 'search terms' actually used in reaching its conclusion that there were no responsive documents located, taken the deposition of the Kia employee who actually conducted the search, called additional witnesses at trial including the individual who authored Kia's June 28, 2019 response letter to NHTSA's April 12, 2019 letter, etc.  Instead, they did nothing during the one-year prior to trial, and then, *after trial had commenced*, they bring the untimely motion for a directed verdict and terminating sanctions."

6

experienced a noncrash fire.[5] And substantial evidence at trial established his vehicle did not experience unresolved engine issues leading to such a fire. The trial evidence was that Higginson's engine's knocking and rattling was the result of carbon build-up that had not reappeared on inspection years later in 2021. On this record, and particularly given the jury's finding that Kia had fixed any defect in Higginson's vehicle, Higginson cannot establish prejudice.

I would reach the same conclusion with respect to Higginson's claim of fraud. He concedes that to establish that claim, he must be able to prove that before his 2013 lease or 2016 purchase, Kia "was aware of a defect . . . *that it was either unwilling or unable to fix.*" (*Santana v. FCA US, LLC, supra,* 56 Cal.App.5th at pp. 345-346, italics added.) Very simply, the jury's verdict—

---

[5] Higginson was required to plead fraud by omission with particularity, including the "content of the omitted facts." (*Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 43; see also CACI No. 1901; *Wimber v. Scott* (2025) 113 Cal.App.5th 349, 354.) In his operative complaint, he alleged that Kia released his vehicle and others "with a 2.0- or 1.6-[liter] GDI engine, which is susceptible to sudden stalling while at any speed and/or to burst into flames"; that Kia knew or should have known about the engine defect, and it failed to disclose it to consumers. More specifically, Higginson alleged that "2012-2016 Kia Souls with the 1.6[-liter] engine have catalytic converters that overheat, resulting in catastrophic engine damage and fires" and that in February 2019, Kia "issued a recall for 378,967 Soul vehicles from the 2012 to 2016 model years, all of which have 1.6-liter direct injection gasoline engines. In these engines, the catalytic converter, which reduces pollutants in exhaust emissions, is susceptible to overheating due to—according to Kia—a programming error. When the catalytic converter overheats, abnormal combustion in the engine can result. This can damage the pistons' connecting rods, potentially fracturing the engine block and causing an oil leak. Connecting rod failure, damaged pistons, and a cracked engine block can all cause sudden and catastrophic engine failure during normal driving, and the resulting leakage of oil onto hot engine parts can result in engine fires."

supported by substantial evidence that Kia repaired the nonconformity in Higginson's vehicle—precludes such proof.

The fact Kia in February 2019 issued a recall does not establish Kia's awareness in 2013 or 2016, prior to Higginson's lease or purchase, of any alleged defect. Kia's June 2019 response indicated that in 2016, it began investigating reports of fires, but that determining their origin and cause was a challenge due to the nature of fire. As both Kia's and Higginson's experts agreed Higginson's Kia Soul vehicle had no catalytic converter issues, nor did the car ever catch on fire, Higginson cannot show a likelihood or reasonable probability that the missing NHTSA documents would have supported his fraud theory. I would hold Higginson has not established prejudice even if the court wrongly denied him a new trial. Higginson concedes that "the facts underlying [his] CLRA claim are the same as those underlying the fraud claim . . . ." Because Higginson is unable to demonstrate error or prejudice with respect to his fraud claim, any error in connection with Higginson's CLRA claim, entirely premised on fraud, is harmless.

Thus, even assuming irregularity of the proceedings in the form of discovery misconduct under Code of Civil Procedure section 657, subdivision (1) is available, a new trial is justified only if it is reasonably probable that Higginson would have obtained a more favorable result absent the misconduct. (*Cassim v. Allstate Inc. Co.*, *supra*, 33 Cal.4th at p. 800; see *Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1122.) The trial court here properly concluded that Higginson could not make this showing; I would affirm.

Finally, I fault the majority for not addressing a fundamental issue raised by Kia in its trial brief, and resolved by the California Supreme Court in *Rodriguez v. FCA US, LLC* (2024) 17 Cal.5th 189, namely whether

8

Higginson's vehicle even qualifies for Song-Beverly protection as a "motor vehicle sold with a manufacturer's new car warranty" under Civil Code section 1793.22. *Rodriguez* explains that phrase does *not* include a used car purchased with an unexpired new car warranty (*id*. at p. 196); in part because the "Legislature highlighted vehicles for which a manufacturer's new car warranty arises upon sale to a retail buyer" and "[t]hus, the phrase 'other motor vehicle sold with a manufacturer's new car warranty' is most naturally understood to mean other vehicles for which such a warranty is issued with the sale." (*Id*. at pp. 199-200; see also p. 196.) Higginson testified he initially leased the vehicle and purchased it several years later. Those undisputed facts—that Higginson exercised a lease option to purchase a now-used vehicle with an unexpired new car warranty—are dispositive of Higginson's Song-Beverly claims as a matter of law.


O'ROURKE, Acting P. J.

9

Filed 2/3/26

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RYAN HIGGINSON, | D082322, D083026 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2020-00010610-CU-BC-CTL) |
| KIA MOTORS AMERICA, INC., | |
| Defendant and Respondent. | |

THE COURT:

The opinion in this case filed January 09, 2026 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the requests pursuant to rule 8.1120(a) for publication are GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

O'ROURKE, Acting P. J.

Copies to: All parties